All rise. The Illinois Appellate Court 3rd Division is now in session. The Honorable Justice Margaret S. McBride is presiding. Good morning everyone. You may be seated. Mayor of Battaglia. Will the attorneys that are going to address the court please step up to the podium and identify yourselves for the record. Appellant first. Good morning, Your Honor. My name is Mark Battaglia. I'm a trained prosecutor. All right. Good morning, Mr. Battaglia. And good morning. Emma McMullen of Legal Aid Chicago. Good morning, Ms. McMullen. Each of you will have about 10 minutes to present oral argument. And from that, Mr. Battaglia, you may save out some time for rebuttal. Save two minutes? Certainly. All right. McMullen, you may be seated. And Mr. Battaglia, you may proceed. Yes. May it please the court. My name is Mark Battaglia. I'm a trained prose. I was the respondent in the case in chief and the appellant in the case before Your Honors. This case presents one overarching issue for review, and that is whether the trial court conducted the proper hearing for the relief that it granted. And the answer to that question is no, it did not. And that proposition is supported by every single case that I cited in my brief and my opponent cited in hers. I did not have to distinguish not one single case in my brief. In every case where a marital settlement agreement was reformed, there was a full evidentiary hearing, replete with pretrial discovery, opening statements, witnesses from the petitioner's case in chief, a motion for directed finding. So, Mr. Battaglia, in your opinion, is it ever appropriate for a trial court to reform an MSA without holding a full evidentiary hearing? Perhaps. If you come across a true Scrivner's error. For instance, there is a misplaced decimal point and a figure is ten times the size that it should be or one-tenth the size that it should be. And it's obvious, it's glaring, it fits within that definition. In your position, is this not a Scrivner's error? No, not even close. This is the misnaming of a bank. If it had been, the name had been, I don't know, Consumer's Credit Bank instead of Consumer's Credit Union, perhaps that would be an example of a Scrivner's error. The marital settlement agreement was modified to reflect the correct bank, was it not? No, it was not. It was never modified, but the amount was the same? I thought Mrs. Battaglia had said at one hearing, no, that's not the correct bank. Yes, at the approval hearing. And you were present there? Correct. And she modified the name of the bank at that time? She said that the name of the bank was the wrong name of the bank. Didn't she say consumers? Yes, she did. And didn't you say that you hadn't been paying enough attention, but you agreed to it? You ignored what she had said? No, this was a hearing via Zoom, and my audio had went out, so I did not hear probably half of my wife's testimony. At the time, though, you said you were distracted, not that your audio had gone out, correct? On the record, that's what you said, you were distracted. I was fixing my audio at that point in time, and I was distracted. Did it ever say that you couldn't hear what was transpiring during the prove-up? During the prove-up? No. Did you ever tell the court that you could not hear what had been said? No. Okay. Okay, can I ask you a question? It looks like we're all very interested, which is good. Before the settlement agreement had been approved, there was discussion about who would pay the $702 for that consumer loan, wasn't there? Yes. And twice didn't you ask that your ex-wife be required to make that payment? I believe I asked once. Okay, but in any event, I thought the record shows it came up twice, and maybe I'm wrong. But the court rejected that and obligated you to continue making those $702 payments, correct? Kind of, not really. Kind of, and then by the time it got around to approving the Myrtle Settlement Agreement, there was in fact, was there not, about a $9,000 debt that was, we'll say, jointly held by you and your wife to the tune of $9,000, and it was owed to the consumer, whatever it's called. Is that a fact or not? Kind of. What do you mean by kind of? You're very close to that. So my allegation was that Wendy took out that loan by forging my signature without my knowledge and dissipated it. All right, let's get to that. Now, your position was, before the settlement was approved, that she had forged that, correct? Correct. Did the court reject that claim by ordering you to keep paying the $702? I would say no. Or the answer is I don't know. I don't know it was in Judge Apparel's head. I don't know why he rejected that. But in any event, you had to keep paying that money. Correct. And in any event, at the time that the Myrtle Settlement Agreement was proposed or agreed to, perhaps, whatever you want to call it, one of the primary goals was to take care of all the debts owed by the parties. Was it not? Wasn't that why you were doing things up? Yes. So settle all the debts owed. Yes. Is there any question that at the time that this Myrtle Settlement Agreement was entered, that that $9,000 was a debt owed by the parties for about $9,000? There was approximately a $9,000 debt owed to Consumers Credit Union. Okay. So that's my question. Now, was there any $9,000 line of credit owed to the bank that you received your mortgage from, or both of you, excuse me, for the business location? First Eagle Bank. Yeah. There was a mortgage at First Eagle Bank for $69,000. Correct. Is there any dispute about that? Yes. There is? There's a dispute about whether $69,000 was owed? Yes. All right. In what way? Wendy said that the debt owed to First Eagle Bank was about $68,000, which would make this mistake maybe a little more glaring. In fact, at the prove-up in May, there was $69,000 and some amount added after that. So you're basing everything on a statement about it was about $68,000 instead of about $69,000? Very significant difference, $69,000. Well, is that how you get your position? It's $1,000. Well, no, no. It's a numeral in the 10,000s place. It is the missing six in front of the nine. Okay. Not arguing over $1,000. Okay. Well, that's not my question. I'm not talking about numerals or dots or commas or periods or whatever or decimal points. If you were, we'd be talking about Scrivener's Error. What I am talking about is was there about – let's put it this way. Was there about $68,000 owed or was there about $69,000 owed on that mortgage? One of the two. Yes, to both of us. Okay, great. Yes, to both of us. And isn't it also a fact that there was no $9,000 line of credit owed? To First Eagle Bank. Yes. Okay. All right. All right. Fine. Now you may proceed. I actually want to follow up a little bit on what Justice McBride just asked you. Mr. Metagli, you are an attorney, correct? Yes. You don't specialize in matrimonial law, but you're an attorney, right? Well, I've practiced matrimonial law for about 20 years. Oh, okay. Well, great. So Article 11 of your MSA said that you had read the MSA, right? And you're a good lawyer. You would have read it, right? Of course. And as Justice McBride said, it also indicated that it contained the entire agreement between you and your wife, right? Yes. Yes. So how do you explain, then, this missing consumer's credit debt? Ellen McMullen left it out. She wrote that thing, and she left it out. That's how I explain it. And there's no explanation in the record as to how that error occurred because it was not a hearing in the trial court. But you read Ms. McMullen's proposed MSA, and why didn't you correct her? When you read it before, you got to prove them. I did. And it's in the record. I told my attorney I want that changed from office line of credit, all right? So the office line of credit, I want that changed to First Eagle Bank, and I want that 9,000 changed to 69,000. That is in the record, that is my testimony, and it is uncontroverted. Did you ask for discovery when the motion was filed? I think Ms. Taggart was going to need to file her motion to correct the judgment. We did not. Neither party opened discovery. So you never asked for discovery. I'm not concerned with them right now, just you. No, I knew I had a winnable case. I didn't ask for discovery. All right, and then at the hearing in front of Judge Shapiro, this was a Zoom hearing, you didn't ask to continue the matter for evidentiary purposes, did you? For evidentiary purposes? For an evidentiary hearing. I didn't get a chance. Okay, and when you say you didn't get a chance, what do you mean? Judge Shapiro controlled that hearing from the very beginning. Did your lawyer ask for a continuance to have an evidentiary hearing? No, when you say you, I presume that you mean me or my lawyer. Yes, yeah. Did either one of you, did either one ask Judge Shapiro for a continuance to conduct what you thought was required and that being an evidentiary hearing? We believed that the judge was going to conduct one on that day. I showed up presuming that Judge Shapiro knew what procedure was necessary. You don't seem to answer questions. I'm not asking you what you presumed that day. I'm asking you whether or not you or your attorney asked to stop what was going on and let's put this over for an evidentiary hearing. Sure. Let me bring the judge's attention to the record, page 13. My lawyer said, and we were before you last, Judge, the one question you asked, you said, show me something that demonstrates that this particular loan is affiliated with the office condo. So my lawyer is expecting some type of evidence from their side that this loan is associated with the office condo. Did he say, show me, Judge? No, no, no, he's quoting Judge Shapiro. Judge Shapiro on the last court date before the hearing.  When we were before you last, Judge, the one question you asked, you said, quote, show me something that demonstrates that this particular loan is affiliated with the office condo, end quote. That's Judge Shapiro getting quoted. All right, and then what's the next line? It is in no way affiliated with the office condo. It's not secured by the office condo. None of these fences went to the office condo. This is all coming after the fact. Who's saying that? My lawyer is making that argument to Judge Shapiro. All right. And the reason he's making that argument is because all along, Wendy has said that this debt of consumers' credit union was affiliated with the office condo. And, in fact, the prior draft of the marital settlement agreement said office condo line of credit. There was no line of credit at consumers' credit union that was associated with, secured by, or went to the benefit of the office whatsoever. So why would I pay a loan at consumers' credit union? The only evidence that was elicited at that hearing from me was that I would never, ever, ever have paid that debt at consumers' credit union. It was forged. Your name was forged. Your signature was forged. My signature was forged. And I have alleged that since early on. This case had been, that loan had been in contention, and it had perhaps been the most contentious issue in this divorce. Early on in this case, I alleged. So why wasn't that litigated earlier, this forgery? Significant issue. Very significant. Allegation of forgery. Yes. Why wasn't it litigated before? Well, I did. I told the judge my signature was forged. Okay, and the judge rejected that, didn't he? No, I wouldn't say he rejected it. Okay, do you think a judge is going to simply dismiss and not even consider a serious allegation of forgery? Really? It's not serious. In 20 years of practicing matrimony, I can tell you, there are far more serious issues than what was alleged. Right, but I don't know any of us sitting up here would just dismiss it and act like it didn't really matter. And, you know, you say it was a forgery, she says it wasn't, and there's never any real hearing like getting in a document examiner to determine whether or not somebody forged your signature. How much do document examiners cost? I don't think it matters. You have made a very serious allegation that your ex-wife forged documents, and it seems to me that it was never really litigated formally. And I'd like to know why. Why, when you made this extraordinarily significant defamatory allegation, you could say it never got heard? It doesn't make sense to me that a judge would just simply let go. It doesn't matter. I think the judge rejected it is what I think. I think the record supports that. No, it doesn't support that. We don't know what Judge Shapiro said. Judge Shapiro could well have said, you know, this is $700 a month. You can afford this. I'm not going to deal with it now. We'll take care of this after trial. And shortly after that, I pushed my attorney to get this case set for trial. That was the more financially intelligent thing to do. Instead of continuing with litigation, which is expensive, and I can tell you my 20 years of practicing matrimonial law, what you need to do is end the bloodshed. All right. Has there been any discussions, then, to end the bloodshed? We're talking about $9,000, aren't we? Yes. All right. Has there been any discussion to end the bloodshed since this appeal was filed? No. Okay. No. You're litigating this on principle for the $9,000, right, Mr. Battaglia? Yes. Because of this alleged forgery. I'm pretty mad about it. I want to ask you one more question. In your brief, you described this as a case of first impression with regard to a Zoom hearing. That caught my attention. So why do you think that muting an attorney on Zoom during oral argument is the same as excluding that attorney from the courtroom or putting him out in the hallway? Well, because he can't listen, but he can't object. In fact, he can't participate effectively. But he can have nonverbal communication, right? Raise a hand. Yes. In fact, Judge Shapiro, at that same hearing, made note of you demonstrating nonverbal communication, correct? And didn't he also allow your attorney, as soon as he unmuted him, to make a full record as to what questions he had or what issues he had after he unmuted him? Yes. Yes, he did. But it's probably, this is not the main thrust of my argument, but it's happened to me numerous times. Well, I wish I could take that back. I have seen it happen to other people numerous times. And, you know, it's probably something that should be addressed at some point. Probably not in this case. But, you know, lawyers on Zoom should not be maybe shut out completely. That should be considered. Even if they're disruptive to the proceedings and the other counsel's argument, they should not be shut out. That's your position? How disruptive? So now we're in a sliding scale. So who's going to make the determination? The trial judge is going to make the determination. Yes. But I want to get back here to an important part of my argument is this. There's really not a good explanation for how this so-called mistake could have happened. And there needs to be. You point out the fact that I'm an attorney. You should also take notice of the fact that Wendy Battaglia has a bachelor's degree and a master's degree. She is an intelligent person. She's also been married to an attorney for 20 years and doesn't fully trust me. So you better believe that she read that marital settlement agreement. And you better believe that she saw that it said First Eagle Bank and it said $9,000. And we don't have a good explanation as to why she let that mistake slide. But I can give you a theory. Wendy wanted to disrupt those proceedings. Wendy wanted to interfere in the middle of that prove-up hearing and say, wait, wait, wait. Wait, there's a mistake. So, Mr. Battaglia, you're asking us to reweigh all the evidence and make credibility determinations, are you not? I'm asking you to reverse the remand because there was not an evidentiary hearing and there needs to be an evidentiary hearing. And if there is not an evidentiary hearing in this case, it is new law. It is new legal precedent. That's sometimes what we do. We make new law. Please don't do it on this case. Well, we're not deciding anything. My main concern is that a serious allegation of forgery seems to be left in the dust and I just can't fathom that it was never addressed. And I find it just impossible to believe that such a serious allegation by you would be left untouched. And, you know, if there should have been any evidentiary hearing, it should have been on that. So we're past that. Anything you want to add now? Because we're going to give you time for rebuttal. Okay. Certainly, certainly, Judge. I will point out, too, I think that Ms. McMullen's reaction at that hearing is very telling, right, at the prove-up. When Wendy says, wait, there's a mistake, the wrong bank's name is used, how does her attorney react to that? Does she question her client? Does she halt the proceedings? Does she say anything to my attorney? For that matter, does Judge Shapiro do anything? The hearing continues to go. It is as if Wendy threw a wrench in the works, Emma grabbed it out of midair, and threw it right back. She wasn't having any of it, all right? So that gives us a lot of insight into what Ms. McMullen thought about her own client's conduct on that day. And when that hearing ended, Emma McMullen emailed the merits settlement agreement and the judgment to Judge Shapiro untouched, unreformed, with everything intact. And it should remain intact. And it wasn't added or drafted. So you still have the maxim of the drafter of the contract has it strictly, mistakes are strictly construed against the drafter, not the opponent who also happens to be an attorney and didn't say anything about it either. So we would ask that you reverse and remand, and that you do so with orders to deny the motion, put this thing to rest. We're going to give you some time for rebuttal still. All right, Ms. McMullen, you may proceed. Good morning. May it please the Court? I am Emma McMullen of Legal Aid Chicago, and I represent Wendy Battaglia, now known as Wendy Wittkamp. This Court should affirm the lower court's decision, whether it finds that the error was a Scribner's error or a mutual mistake, because the Court utilized sufficient and proper procedure to make either finding. Before turning to my argument, I want to just briefly address one inconsistency that Mr. Battaglia mentioned. The lower court did consider this loan on two separate occasions, once in August of 2019 and again in October of 2020. And would you just give us a rehash or give us a history of those two occasions when the Court actually considered this particular issue? Yes, Your Honor, or yes, Justice McBride. Prior to our entry of the case in October of 2019, there appears to have been a hearing on this issue. Mrs. Battaglia had requested that the Court reconsider the allocation of the debts, because at that time she was paying a significant amount of the monthly marital expenses. According to the order that Mr. Battaglia himself wrote, it says that there was a hearing in this matter. I was not present on that court date, so I'm just going off what the record indicates. And then again in October of 2020, Mr. Battaglia had filed a motion to reallocate some of these marital debts back to his wife. And at that time, we were present, and there was in fact another full hearing on this issue, and it was ordered that he would continue paying that sum. Was an allegation made at that time that the loan from consumers was forged by Mrs. Battaglia? Mr. Battaglia did raise that issue somewhat briefly in his briefings on this matter. He did state that it was forged. The judge did hear that argument and did order that he continue to make those payments. And prior to that, in the hearing before, you were not present. Correct. There's no hearing transcript in this record. Correct. And what was the allegation at that time? Did Mrs. Battaglia ask to be relieved from paying the $702? I believe that it was not specifically for this debt, but rather just that generally the marital expenses be somewhat shifted between the parties. And when did that shift occur? That shift occurred first after that August 2019 hearing. Right. And after that shift, the $702 monthly payment for the consumer's loan was ordered to be paid by Mr. Battaglia. That is correct. Is there a suggestion that at that time he protested because that document had been forged? As far as I can tell, no. Okay. But you do indicate that at the second time, when I don't know who was asking to shift the payments or what, at the second hearing, he was ordered to continue making the $702 payments to this consumer loan. Correct. Is there any question in your mind that at the time that the settlement agreement was reached, that there was a $9,000 debt owed to consumers? No. Okay. All right. You can proceed. Why didn't you include it? So in the draft that we had sent over to Mr. Battaglia's attorney, Mr. Vargas, our systems were down at the time, and I was unable to access the name of the bank. I was aware from settlement conversations that Mr. Battaglia was to be paying the $9,000 debt, which is why it is listed as $9,000 in the debt chart. Unfortunately, I just could not access the party's financial records, which is why I asked Mr. Vargas to insert the bank name associated with that $9,000 debt. You claimed that the change from office line of credit to First Eagle Bank was made by Mark, right? Either Mark or Mr. Battaglia or his attorney. Or Mr. Vargas. Correct. But his attorney's response indicates that all of his changes were redlined, and the record shows that the change from office line of credit to First Eagle Bank line of credit is not redlined. So who exactly made that change? I cannot explain why that redline is not appearing in the document, but what the record also reflects is that when I received the document back from Mr. Vargas, that bank name was in that line. I think that just as Mr. Battaglia suggests that this may have been a ploy on behalf of Wendy, it's possible that he made this change without redlining it on purpose to create that record. I don't know that with certainty, but I know how I received the document. But you originally, when you tended it to them, you called it an office line of credit. Correct. But that's not really the majority, or perhaps there isn't evidence that any of it was used for office line of credit. That was what was addressed in Article 2, that Mr. Battaglia is to be responsible. He's going to get his office, and he has to be responsible for the mortgage on his office. So why would this be listed as office line of credit? As Mr. Battaglia states in his argument and in his brief, it was Mrs. Battaglia's understanding that this loan was connected to the office. And that was my understanding as well as that was my client's understanding. That was the $9,000 debt, and as she states, it was used in large part to refurbish the office itself. Was there a mistake in the same debt chart so that there was a reflection of a $9,000 mortgage and not a $69,000 mortgage? No. The mortgages were listed separately under the real property section of the document. And under the real property section of the document, it reflects that there's about a $69,000 mortgage outstanding. The numbers are not specifically listed there. It just said mortgage, right? It didn't say $69,000. That is correct. It was not $69,000 at the time of the entry. Well, when did it become $69,000? It was $69,000 prior. And did the judge ever have to – did the judge ever indicate that there was a Scribner's error as far as the $69,000? He did not. Is there any evidence that there was any question at any time how much was owed on that mortgage? There is not. Okay. You can continue. Moving to my first point, how the court utilized sufficient and proper procedure to determine that a Scribner's error existed. A Scribner's error is a minor mistake or inadvertence that is not decisional or judgmental and is manifestly incongruous with the remainder of the contract. The intent of marital settlement agreements generally, as well as the stated intent of this document, is to divide all of the parties' assets and debts. Mr. Vitaglia suggests that he intended to list the mortgage twice and to leave a $9,000 debt out of the contract completely, which would not effectuate the purpose of marital settlement agreements generally or this document specifically. Judge Shapiro presided over this matter for two and a half years. In that time, he heard about six hearings between the parties, as well as many contentious status states. He is the one who is most suited to make the credibility determination in this matter, and his interpretation is that Mr. Vitaglia's position was unbelievable and manifestly incongruous with the remainder of the contract. Mr. Vitaglia is now trying to rewrite history and tell you that all along, he intended to enter into terms of a contract that was inconsistent with itself. Judge Shapiro saw this reality. He conducted a hearing that consisted of oral argument, reviewing prior sworn testimony, taking new testimony, eliciting his own testimony, reviewing exhibits, and only then did he make his finding and reform the contract accordingly. Ms. McMillan, though, coming back to that MSA, you prepared it on behalf of Wendy, right? I prepared the bulk of the document, yes. And so why shouldn't all ambiguities in it be construed against you, you and Wendy? The only ambiguity in the contract is the ambiguity that was added by either Mr. Vitaglia or his counsel. So to that point, I didn't distract from the character. You're coming back to what your client had told you about that this was an office line of credit, right? That Mr. Vitaglia specifically says had nothing to do with this office. The office was addressed in Article II, not in Article V of the MSA, correct? That is correct. And to that point, what I drafted was the piece stating that the $9,000 debt would be attributed to Mr. Vitaglia, and I maintain that that is the intention of the parties at the time of settlement. Ms. Shapiro, do you agree that Wendy had the burden of proof at the proof-up hearing as a petitioner? Yes. So does her failure to cross-examine Mark to confirm that Consumers was the creditor of the $9,000 line of credit impact, whether she met her burden with respect to the creditor for the $9,000 debt? Mrs. Vitaglia, in the testimony that she provided, stated that the debt itself was $9,000. Mr. Vitaglia says that nothing occurred when it was identified that the bank was the wrong name, and what was most important was that balance confirmation that the $9,000 debt was being assigned to Mark. In principle, the $9,000 debt is what was being agreed to. The bank name is less important than the fact that the loan was being assigned to Mr. Vitaglia. Anything further? Just briefly, I also would like to point out that the Court acted appropriately if it found this to be a mutual mistake. It held up the proper hearing in order to determine that that occurred. It had the proper standard of clear and convincing evidence. It used a demonstrated rational process when it did what I've previously described in conducting that hearing, and it examined relevant facts. Mr. Vitaglia asserts that the Court could have reviewed more testimony, but he failed to cross Mrs. Vitaglia at the prove-up hearing. He failed to call her as a witness in the second hearing. And he did, in fact, testify at that second hearing. So his testimony was not uncontributed as it was compared to her. But Judge Shapiro stopped the hearing and didn't continue it as an evidentiary hearing. So you didn't allow Mr. Vitaglia to call Mrs. Vitaglia as a witness, correct? Mrs. Vitaglia was... You stopped it because he had to get on to another hearing, didn't he? There was about 15 minutes left at the end of the hearing prior to what he says is his 4 o'clock. There would have been time for, at a minimum, Mr. Vitaglia to offer to ask for a continuance to state that he would like to continue this matter and have Mrs. Vitaglia testify at a later date. He could have called her as a brief witness, and his attorney didn't do any of those things. And just to point out, her prior sworn testimony was evidence in this matter that is very clear from the precedential cases in this matter. So to his point that his testimony is uncontroverted, that is not true. For the aforementioned reasons, we respectfully request this Court to affirm the lower court's ruling and find that the error was either a Scribner's error or a mutual mistake. All right. Thank you. Thank you. Mr. Vitaglia, you may have a brief response. So the argument in this case has really kind of gotten maybe a little bit outside of the central issue. The issue is, was the hearing proper? And the answer is, it was not. It doesn't matter whether I caught the mistake beforehand or afterwards or whether my microphone wasn't working during the prove-up. Did Judge Shapiro conduct a proper hearing? He did not conduct a proper hearing. I would point out, too, it was kind of interesting what Ms. McMullen said about the allegation that she made against me. In their motion, they don't even say that I agreed to pay that debt. Instead, at paragraph 6, they say it was Wendy's understanding from negotiations. Keep in mind, I didn't negotiate with Wendy. My attorney negotiated with Emma McMullen. So if there's a misunderstanding, it's between Emma and her client. So there's not even like the smoking gun that is necessary in this case to prove that I agreed to pay that consumer's union debt. Even Judge Shapiro doesn't even say that I agreed to pay it. He uses the term equitable. Could I just go back, then, to the prove-up hearing? Yes, ma'am. Okay. Because it's in your brief, and on page 5 at that hearing, you do agree that Judge Shapiro was the presiding judge of this case, right? He had been involved in the case? Yes. Oh, okay. In August 2019. Okay, so at that hearing, Mrs. Battaglia was asked by her attorney about the line of credit at First Eagle. And so here's the little remarks. Mr. Battaglia will pay. Mr. Mark Battaglia, who I will be referring to for the remainder of questions, will pay the debt, pay the line of credit at First Eagle Bank. And then she answered, it's at Consumer Bank. Is that consumer credit? Yes. Mr. Battaglia will pay the outstanding balance on the water bill. And then Mrs. Battaglia says, yes, and the balance of that other account was $9,000. Returning to the question about the line of credit, is that what you're referring to? Yes. The balance is approximately $9,000. And you say that Mr. Battaglia will pay the outstanding balance of the water bill. Is that correct? Yes. And her attorney says nothing further. Okay, and then your attorney didn't ask Wendy any questions. And then at that same hearing, you were called and you were asked, I think as Judge Walker indicated earlier, and as an attorney you reviewed this document and fully understand all the terms. Answer correct. And you intend to be bound by the terms of the settlement. Correct. And you're satisfied by all the terms. Correct. And you've heard the questions that were asked to Wendy and the answers she gave. I was distracted. Did you, for the most part, hear the questions and answers that Wendy Battaglia gave this morning pursuant to the prove-up that we're conducting at the moment? I have to admit I did not. And if you look at page 8 of the settlement, it has a chart that outlines all of your respective debts that you've agreed to take on. Correct? Correct. And you're satisfied with taking on those debts? Yes. Okay. So you're saying that does support your position here, that you weren't agreeing to the consumer debt? Correct. And this was signed on the eve of this prove-up the night before. And if it didn't get settled, there would be a continuance. And like you said, I've done this for 20 years. It means I've got to pay my lawyer. That means I miss out on Wendy's. I collect a portion of Wendy's pension. I miss out on three months of that. Pretty soon, it starts to become not worth it to take a continuance. It's not perfect. I don't expect perfection in the circuit court, but it was good enough. I got what I wanted out of that, and I expect everybody to be bound by what we all signed. So I asked that it be reversed, remanded, with an order to deny. All right. Thank you. Thanks. All right. Court will stand adjourned briefly. We're going to switch cases and move.